IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN K. THOTTATHIL, ) | |
| ) | **COMPLAINT** |
| Plaintiff, ) | |
| ) | Case No.: |
| vs. ) | |
| ) | Jury Trial Demanded |
| WATERVILLE VALLEY TECHNOLOGIES, ) | |
| INC., a Rhode Island Corporation and JAMES ) | |
| PELTIER, Individually, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff, Dr. John K. Thottathil ("Dr. Thottathil"), by and through his attorneys Roth Law Group LLC and Diehl Law LLC, as and for his complaint against Defendants Waterville Valley Technologies Inc. ("Waterville") and James Peltier ("Peltier"), states as follows:

### PARTIES

1. Dr. Thottathil is a citizen of the state of Illinois who resides at 28630 Skycrest Drive, Ivanhoe, Illinois 60060.

2. Defendant Waterville is a Rhode Island corporation with its principal place of business located at 22 Manton Avenue, Providence, Rhode Island 02909.

3. Defendant Peltier is President and CEO of Waterville and he is citizen of New Hampshire who resides in Waterville, New Hampshire.

### JURISDICTION

4. This Court has subject matter jurisdiction over this action as it concerns the Patent Laws, 35 U.S.C. et. seq. Accordingly, this Court has federal question jurisdiction over Count I of this action pursuant to 28 U.S.C. §§ 1338(a), (b).

5. Supplemental jurisdiction under Counts II, III, IV and V is proper under 28 U.S.C.

§ 1367.

6. This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 as the matter in controversy is between citizens of different States, and on information and belief, exceeds the sum or value of $75,000, exclusive of interest and costs.

**FACTS**

7. Dr. Thottathil is the inventor of a prodrug technology related to oxycodone and oxymorphone ("the Thottathil Prodrug Technology").

8. A prodrug is a medication or compound that, after administration to a human body, is metabolized or converted within the body into a pharmacologically active drug, the parent drug.

9. Optimal pain management requires the selection of analgesic drugs that achieve rapid efficacy with minimal side effects. Traditionally opioid analgesics, such as oxycodone and oxymorphone, have provided important options for pain treatment.

10. However, oxycodone and oxymorphone both provide rapid effects in the body, and because of the rapid onset of euphoric effects, these drugs are frequently abused.

11. Dr. Thottathil's Prodrug Technology delays the immediate euphoria that drug abusers seek and is therefore a valuable technology to deter abuse. Further, his Prodrug Technology protects against accidental and intentional overdose, misuse and abuse through crushing and intranasal snorting, non-prescribed methods of use (e.g., intravenous), and "dose–dumping" (e.g., mixing with alcoholic beverages).

12. In 2010, Dr. Thottathil was searching for funding and resources to commercialize his Prodrug Technology.

13. In 2010, Dr. Thottathil met Peltier. At the time, Peltier, upon information and belief, owned CSCS Corporation, a Rhode Island corporation ("CSCS").

14. In June 2010, Dr. Thottathil and CSCS entered into a Mutual Nondisclosure Agreement, and Dr. Thottathil, CSCS and Defendant Peltier began discussing the commercialization of Thottathil's Prodrug Technology.

15. In early 2011, Dr. Thottathil and CSCS executed a second Mutual Nondisclosure Agreement, and subsequently disclosed additional information relating to Thottathil's Prodrug Technology.

16. From 2011 through mid-2013, Plaintiff provided confidential information and presentations to CSCS and Defendant Peltier in an attempt to secure funding from various entities.

17. During this time period, a series of negotiations regarding Dr. Thottathil's involvement with CSCS and Peltier took place in Chicago, Illinois.

18. In May 2013, CSCS proposed an agreement to move forward developing Thottathil's Prodrug Technology. The proposed agreement provided that:

- "When CSCS gets financing to move forward with a program to develop new drug technologies based on the prodrug platform (or other related technologies brought to CSCS by you), you will become a full time CSCS Corp's employee with an initial salary of $150,000 with the other company benefits available to every employee (401 K, health, discretionary bonus, etc.) We would expect you to be working on site in Rhode Island. Once a drug candidate moves to the approval stage (filing initiated) CSCS will adjust you salary to current market value."

- "If a drug candidate actually makes it to the market, you would receive 15% of the royalties/license agreement with no cap. This would apply to each individual drug royalty/license agreement that you and CSCS Corp. would

  develop together that reaches the market. In addition you will receive 10% of any milestone payments made to CSCS by a third party (after deducting the amount allocated toward expenses)."

- "For patents and intellectual property generated during your tenure at CSCS they would be owned by either CSCS or the customer depending on the agreement put in place. You and anyone else involved in generated the intellectual property would be listed on any patents (that again would be property of either CSCS or the company)."

- "You will be responsibility [sic] for the overall chemistry of any projects and will lead and mentor the chemists working on the projects."

19. Dr. Thottathil developed a PowerPoint presentation that generically explained the Thottathil Prodrug Technology.

20. Upon information and belief, Defendant Peltier began showing Dr. Thottathil's PowerPoint presentation to third parties.

21. Despite Peltier's representations regarding CSCS' resources and ability to commercialize Thottathil's Prodrug Technology, CSCS declared bankruptcy in the Fall of 2013.

22. At the time of CSCS' bankruptcy, Defendant Peltier failed to disclose the bankruptcy to Plaintiff, and instead, represented that CSCS was being sold, and that the buyers of CSCS had agreed to fund at least one of the parties' projects.

23. Defendant Peltier further represented at that time that a third-party entity had definitively agreed to fund the parties' work on the Thottathil Prodrug Technology.

24. Upon information and belief, Defendant Peltier's representations regarding the sale of CSCS and his ability to secure funding for CSCS to move ahead with Thottathil's Prodrug

4

Technology were false.

25. In October 2013, Defendant Peltier formed Defendant Waterville, a Rhode Island corporation.

26. At the time Peltier formed Waterville, he again represented to Plaintiff that he had secured funding for the commercialization of Plaintiff's inventions.

27. On or about September 9, 2014, Dr. Thottathil and Defendant Waterville entered into an agreement ("the Thottathil/Waterville contract"), attached as Exhibit "A," that provided:

- "When WVT gets financing to move forward with a program to develop new drug technologies based on the prodrug platform (or other related technologies brought to WVT by you), you will become a full time WVT Corp's employee with an initial salary of $200,000 with the other company benefits available to every employee. If the current project (Oxymorphone) funding ceases then the salary will cease as well."

- "You will also receive 50% of the WVT's net profits for the individual named projects weather [sic] generated through royalties/license agreement, or sale with no cap. This agreement applies to the current Oxymorphone project/product only. If you and WVT Corp develop future projects together a separate addendum will be generated for each individual projects/products at that time."

- "For patents and intellectual property generated during your tenure at WVT, they would be jointly owned (50/50) by you and WVT or the customer depending on the agreement put in place. You and anyone else involved in generated the intellectual property would be listed on any patents (that again

5

> would be property of John Thottathil/WVT or the company)."
>
> - "You will be responsibility [sic] for the overall chemistry of any projects and will lead and mentor the chemists working on the projects."

*See* Agreement dated September 9, 2014, attached hereto as Exhibit "A."

28. Negotiations between Dr. Thottathil, Waterville and Peltier regarding Dr. Thottathil's involvement with Waterville took place via phone calls and email with Dr. Thottathil while he was in Chicago.

29. Plaintiff Thottathil developed the Thottathil Prodrug Technology and it was very important to him that he oversee the chemistry work on his technology.

30. There is no agreement between Dr. Thottathil and Waterville and Peltier relating to the use of the Thottathil inventions, ideas, or confidential information other than for Oxymorphone. For example, and without limitation, there is no agreement relating to Oxycodone.

31. Upon information and belief, a private equity firm provided funding to Midas Pharmaceuticals ("Midas"). Upon information and belief, Midas in turn provided funding to Waterville, under contract, to develop oxymorphone using Thottathil's Prodrug Technology. This research work started in the fourth quarter of 2014)

32. Dr. Thottathil never became an "employee" of Waterville, although Peltier started paying a monthly consulting fee to Dr. Thottathil beginning in October 2014 through November 2015.

33. Waterville contracted with Albany Molecular Research, Inc. ("AMRI"), located in Albany New York, to develop oxymorphone drug candidates based on the Thottathil Prodrug Technology, and AMRI commenced work with Waterville in the fourth quarter of 2014)

34. Starting in October or November 2014, Dr. Thottathil traveled frequently to AMRI

from Chicago, and stayed in Albany for weeks at a time, to work in AMRI's laboratory to oversee and direct the work that was being performed at AMRI on the oxymorphone drug candidates.

35. Under Dr. Thottathil's leadership and direction several oxymorphone drug candidates based on the Thottathil Prodrug Technology were developed at AMRI.

36. In February 2015 while Dr. Thottathil was out of the country, upon information and belief, Waterville and Peltier secretly initiated a second project based on Dr. Thottathil's Prodrug Technology targeting the opioid known as oxycodone with AMRI without having any prior discussion, notice, authorization or agreement from Dr. Thottathil.

37. Upon information and belief, in or around April or May 2015, Defendants Waterville and Peltier contracted with AMRI to continue development of oxymorphone/oxycodone products based on Dr. Thottathil's Prodrug Technology. As part of this arrangement with AMRI, Defendants required AMRI to keep the additional work secret from Dr. Thottathil.

38. Starting November 2015, Thottathil has been totally excluded and cut-off from information regarding research work, data, results, status, progress reports and discussions with AMRI and other involved third parties). Thus, as a result of Defendants' actions, Dr. Thottathil has been prevented from overseeing the research, development and manufacturing of the products that are based on Thottathil's Prodrug Technology.

39. Upon information and belief, Defendants and AMRI are continuing to secretly develop for potential commercialization a range of products based on Dr. Thottathil's Prodrug Technology without Dr. Thottathil's permission, knowledge, or involvement.

40. As a result of Defendants' conduct, statements and omissions, Dr. Thottathil has been prevented from pursuing the commercialization of the Thottathil Prodrug Technology with

other interested and reliable partners.

41. As a result of Defendants' conduct, statement and omissions, the commercialization of the Thottathil Prodrug Technology has been significantly delayed, which in this industry represents very substantial monetary losses.

42. Upon information and belief, Defendants fraudulently filed a provisional patent in the second quarter of 2015 based on and encompassing the Thottathil Prodrug Technology without the knowledge or agreement of Thottathil, without naming Dr. Thottathil as the inventor. In this industry, such misappropriation of intellectual property has severely damaged Dr. Thottathil's reputation and markedly impaired his ability to freely license and develop his own intellectual property with other parties.

**COUNT I**
**CORRECTION OF INVENTORSHIP OF ONE OR MORE U.S. PATENT APPLICATIONS**

43. Dr. Thottathil repeats and re-alleges the allegations of the paragraphs above as if fully set forth here.

44. Upon information and belief, the patent application or applications filed by Defendants' are based on Thottathil's Prodrug Technology.

45. Upon information and belief, the patent applications filed by Defendants do not list Dr. Thottathil as an inventor.

46. Upon information and belief, Dr. Thottathil is an "inventor" pursuant to 35 U.S.C. et. seq. for the patent applications filed by Defendants and this Court should order the correction of the inventorship of patent applications filed based on the Waterville and AMRI projects.

## COUNT II
## BREACH OF CONTRACT

47. Dr. Thottathil repeats and re-alleges the allegations of the paragraphs above as if fully set forth here.

48. The Thottathil/Waterville contract provided that Dr. Thottathil was to be responsible for the overall research, development, patent and manufacturing of any projects and would lead and mentor the personnel working on the projects.

49. As described in the paragraphs above, Waterville and Peltier cut Dr. Thottathil out of the work on Thottathil's Prodrug Technology for oxycodone and oxymorphone so that Dr. Thottathil was not responsible for the overall research, development of all of the projects, in breach of Thottathil/Waterville contract.

50. The Thottathil/Waterville contract also specified that patents generated during Dr. Thottathil's tenure at Waterville would be jointly owned by Dr. Thottathil and Waterville.

51. As described in the paragraphs above, upon information and belief, Waterville filed at least one provisional patent application in the United States Patent and Trademark Office (the "USPTO").

52. Upon information and belief, no part of the patent application or applications filed by Waterville in the USPTO is assigned to Dr. Thottathil.

53. Defendant Waterville breached its contract with Dr. Thottathil such that it has forfeited its right to ownership of the patent application or application.

54. This Court should order that the patent application or applications filed by Waterville are assigned exclusively to Dr. Thottathil.

## COUNT III
## SCHEME OF FRAUD

55. Plaintiff Thottathil repeats and re-alleges the allegations of the paragraphs above as if fully set forth here.

56. At the time that Peltier began his relationship with Plaintiff and Waterville, Peltier had a pre-exiting intent to defraud Plaintiff.

    i. In particular, as a means to defraud Plaintiff and unlawfully take control of Thottathil's Prodrug Technology, and profit from taking Plaintiff's inventions, Peltier had previously misrepresented the financial stability of his earlier company, CSCS, along with the business dealings of CSCS, CSCS's resources, Peltier and CSCS's plan for Plaintiff's inventions, and Peltier and CSCS's ability to provide resources and funding for the commercialization of Plaintiff's inventions.

    ii. Further, Defendant Peltier individually, and on behalf of Defendant Waterville, intended to defraud Plaintiff and unlawfully take control of Thottathil's Prodrug Technology, and profit from taking Plaintiff's inventions, by having the preexisting intent to cut Plaintiff out of the commercialization process, by misrepresenting the ability of Waterville to obtain funding and resources to commercialize Plaintiff's inventions, by interfering with Plaintiff's work on the Prodrug Technology at AMRI, by requiring AMRI to keep the ongoing work on the Prodrug Technology secret from Plaintiff, and by seeking patents for Plaintiff's inventions without including Plaintiff on the patents.

    iii. Defendants' preexisting intent to defraud is further evidenced by the fact

    that once Dr. Thottathil's inventions and products had been fully disclosed, Defendants' excluded Dr. Thottathil from the process and have continued pursuing development for future commercialization.

   iv. Finally, Defendant's preexisting intent to defraud Dr. Thottathil is evidenced by the fact that Defendants explicitly stated that Dr. Thottathil would be responsible for overall research, development and manufacturing of the products developed as a result of his technology, only to specifically exclude Plaintiff from the process once Dr. Thottathil's inventions and technology had been fully disclosed and work-in-progress sufficiently advanced so as to seize control when the likelihood of success had been sufficiently increased by Thottathil's work investment.

 57. In carrying out the scheme to defraud Plaintiff, Defendants Peltier and Waterville made repeated false promises, both verbally and in writing, over the course of multiple years.

   i. These false promises included, but were not limited to, Defendants' promises that the funding and resources needed to commercialize Plaintiff's inventions were materializing; Defendants' promises that Plaintiff would have overall control over the projects, lead the chemists working on the projects, and mentor the chemist's working on the projects; and Defendants' promise that Plaintiff would be a joint owner in all patents and intellectual property generated during Plaintiff's relationship with Waterville.

 58. The egregiousness of Defendants' conduct is evidenced by the fact that Defendants' are currently pursuing Plaintiff's inventions in order to seek profit for their own benefit, but have entirely excluded Plaintiff.

59. Defendants' conduct, as described herein, was willful and reckless.

60. Dr. Thottathil has suffered damage and continues to suffer damages as a result of Waterville's and Peltier's actions.

## COUNT IV
## MISREPRESENTATION/FRAUD

61. Plaintiff Thottathil repeats and re-alleges the allegations of the paragraphs above as if fully set forth here.

62. In order to entice Plaintiff into entering into a relationship with CSCS, and Defendants Peltier and Waterville, Defendants made numerous false representations.

63. In particular, Defendant Peltier misrepresented on multiple occasions the financial stability and resources of CSCS, and ability of CSCS to secure funding for the commercialization of Dr. Thottathil's inventions.

64. Defendants' misrepresented on numerous occasions the ability of Defendant Waterville to commercialize Plaintiff's inventions in an expeditious manner.

65. Defendants were aware that Dr. Thottathil put great importance on his involvement in the research, development and manufacturing of the products.

66. As a result, Defendants made numerous false representations to Dr. Thottathil regarding his involvement in order to entice Dr. Thottathil.

67. In particular, Defendants falsely represented to Dr. Thottathil that he would be responsible for the overall research, development and manufacturing of the products, along with the mentoring of personnel involved with the projects.

68. The fallacy of these representations is evidenced by the fact that Defendants have specifically excluded Dr. Thottathil from the entirety of the projects despite Defendants' continued pursuant of the commercialization of Thottathil's Prodrug Technology.

69. It was reasonable for Dr. Thottathil to rely on Defendants' representations regarding the financial resources, the existence of funding, and Dr. Thottathil's involvement in the projects.

70. As a result of Dr. Thottathil's reliance on Defendants' misrepresentations, Dr. Thottathil has been precluded from pursuing the commercialization of Thottathil's Prodrug Technology, and the commercialization of the Thottathil Prodrug Technology has been significantly delayed.

71. Defendants' false representations were willful and reckless.

72. Dr. Thottathil has suffered damage and continues to suffer damages as a result of Waterville's and Peltier's actions.

## COUNT V
## VIOLATION OF THE ILLINOIS TRADE SECRET ACT
## (75 ILCS 1065 et. seq.)

73. Plaintiff Thottathil repeats and re-alleges the allegations of the paragraphs above as if fully set forth here.

74. Defendants Waterville and Peltier had access to Dr. Thottathil's trade secrets, including, but not limited to, technical and non-technical data, formulas, research summaries, , methods, techniques and processes.

75. Dr. Thottathil attempted to keep his trade secrets confidential through the use of written and verbal promises of confidentiality, especially since any prior public disclosure could have compromised patentability of his discoveries.

76. Defendants Waterville and Peltier were aware of Dr. Thottathil's attempt to keep his trade secrets confidential as a result of Defendants' relationship with CSCS.

77. Pursuant to numerous oral and written agreements, Defendants promised to keep

13

Dr. Thottathil's trade secrets in confidence and agreed not to disclose those secrets to any third parties.

78. Defendants Waterville and Peltier misappropriated Dr. Thottathil's trade secrets by means of their fraudulent conduct and contractual breaches described herein.

79. Defendants Waterville and Peltier actually used Dr. Thottathil's trade secrets to pursue the commercialization of the Thottathil Prodrug Technology through additional research, additional testing, and applications for patents.

80. Upon information and belief, Defendants Waterville and Peltier have already experienced a pecuniary gain as a result of their misappropriation of Dr. Thottathil's trade secrets.

81. Upon information and belief, Defendants Waterville and Peltier anticipate experiencing a pecuniary gain as a result of their misappropriation of Dr. Thottathil's trade secrets.

82. Upon information and belief, Defendants Waterville and Peltier have disclosed Dr. Thottathil's trade secrets to other third parties without Dr. Thottathil's knowledge or permission.

83. Defendants Waterville and Peltier's misappropriation of Dr. Thottathil's trade secrets was willful and malicious.

84. Dr. Thottathil has suffered damage and continues to suffer damages as a result of Waterville's and Peltier's actions.

WHEREFORE, Plaintiff Thottathil demands judgment in its favor and against Defendants Waterville and Peltier as follows:

A. A finding that Dr. Thottathil is the rightful inventor and owner of the patents filed by Defendants, and accordingly that Defendants must assign such ownership, and promptly confirm such assignment of ownership by proper notice to any and all U.S. and foreign patent authorities, that will enable Dr. Thottathil to personally and exclusively proceed with any and all

matters related thereto, including but not limited to negotiation, amendment, inventorship, assignment, licensing, and sale;

B. That all legal and equitable rights vested in Defendants as a result of their knowledge of and pursuit of Thottathil's Prodrug Technology be transferred and assigned to Dr. Thottathil, and that Defendants shall immediately desist in all further conduct and activities related to the pursuit of Thottathil Prodrug Technology;

C. A finding that Defendants breached the Thottathil/Waterville Contract;

D. Rescission of the Thottathil/Waterville Contract as a result of Defendants' scheme of fraud;

E. Rescission of the Thottathil/Waterville Contract as a result of Defendants' misrepresentations and fraud;

F. Provision of any and all Defendants' communications, data, results, reports, research summaries, business contacts and communications with third parties, contracts or copies of communications with third-party financial firms or actual or potential investors, current contact information for these parties, and any other work product or information that has been or may be related to Thottathil Prodrug Technology from 2009 onward.

G. Termination of the Defendants' contract with AMRI, and any other vendor involved by the Defendants directly or indirectly in activities related to Thottathil Prodrug Technology, along with definitive assignment of work product ownership assignment by AMRI or other vendors to Thottathil, and provision to Thottathil of any and all communications, data, results, reports, research summaries and any other work product conducted by AMRI or other such vendors.

H. Punitive damages as a result of Defendants' willful, reckless and repeated tortious

conduct;

    I.    Exemplary damages pursuant to 765 ILCS 1065/4 as a result of Defendants' willful and malicious misappropriation of Plaintiff's trade secrets;

    J.    Attorneys' Fees pursuant to 765 ILCS 1065/5 as a result of Defendants' willful and malicious misappropriation, along with court costs if any incurred by Thotttathil in these proceedings;

    K.    Compensatory damages;

    L.    Consequential damages;

    M.    That Defendants, their agents, servants, employees, officers, attorneys, successors and assigns, and all persons acting in concert with them, be enjoined in this and all other judicial districts in the United States, preliminarily during the course of this litigation and permanently from: 1) manufacturing, distributing, selling, offering for sale, holding for sale or advertising any products, merchandise or goods bearing the name, trademarks, of plaintiff; and 2) representing that any products, merchandise or goods manufactured, distributed, sold, held for sale or advertised by them are sponsored or authorized by Plaintiff in this district or in any other district in which Plaintiff seeks to enforce this Court's injunction order; and

    N.    Such other and further relief as the Court may deem just and proper.

## TRIAL BY JURY DEMANDED

Dr. Thottathil requests trial by jury on all issues triable at law.

Respectfully submitted,

**DR. JOHN K. THOTTATHIL**

By: /s/ Karl W. Roth
       Karl W. Roth, *Counsel for Plaintiff*

**Dated: June 29, 2016**

Karl W. Roth
IL ARDC No.: 6275808
William P. Foley
IL ARDC No.: 6294672
ROTH LAW GROUP LLC
150 N. Michigan Ave., Suite 800
Chicago, Illinois 60601
Telephone: (312) 419-9599
kwr@rothlawgroup.com
wpf@rothlawgroup.com

Glen M. Diehl, Esq.
DIEHL LAW LLC
20 Shawnee Drive, Suite B
Watchung, NJ 08833
(Pro Hac Vice Application Pending)
Telephone: (908) 310-2764
gdiehl@diehltrials.com